UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| ELKHORN-HAZARD COAL LAND, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ENTERPRISE MINING COMPANY, LLC,<br><br>    Defendant. | Civil No. 13-108-ART<br><br>**MEMORANDUM OPINION AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This breach-of-contract action presents two questions to the Court: First, did the lease at issue impose a duty to mine on Enterprise Mining Company, LLC ("Enterprise")? Second, did the lease require that Enterprise receive permission from the Lessor, Elkhorn-Hazard Coal Company ("Elkhorn"), before surrendering coal-mining premises back to Elkhorn? Because the answer to both questions is "no," the Court will grant Enterprise's motion for summary judgment and deny Elkhorn's motion for summary judgment.

## BACKGROUND

Elkhorn owns coal-mining property in eastern Kentucky. In 2001, Elkhorn leased some of its land to Diamond May Coal Company ("Diamond")—Enterprise's predecessor. Diamond received the right to mine the coal in exchange for paying Elkhorn royalties from the sale of the coal. R. 6-1 at 2, 6–7 (the "Lease"). Additionally, Diamond agreed to pay certain minimum royalties regardless of how much—if any—coal it mined. R. 6-1 at 6, 11–12. By 2006, Enterprise and Diamond merged, and Enterprise took over Diamond's rights

and responsibilities under the Lease. *See* R. 6-7 at 2 (Fifth Supplement to the Lease). Over the life of the Lease, the parties added several parcels of land to the Lease, some of which Enterprise surrendered back to Elkhorn. This suit centers on one such parcel: the Sugar Branch Premises.

In December 2011, Enterprise began shutting down operations on one mine in the Sugar Branch Premises, the EMC #8 mine. R. 14-1 (letter from Enterprise agent Paul Mullins, dated January 31, 2012). Nine months later, Enterprise gave written notice that it would surrender the Sugar Branch Premises back to Elkhorn. R. 6-12 (letter from Paul Mullins, dated September 24, 2012). Shortly thereafter, Elkhorn brought this diversity action for a declaratory judgment, compulsion of arbitration, and breach-of-contract damages. R. 1. Elkhorn seeks a declaration that Enterprise breached the Lease by failing to conduct its mining operations according to the Lease terms, damages associated with the breach, and to compel Enterprise to arbitrate the dispute. *Id.* at 7–9.

The parties filed cross-motions for summary judgment. R. 98 (Enterprise), R. 103 (Elkhorn). For the reasons stated below, the Court will grant Enterprise's motion and deny Elkhorn's motion.

## DISCUSSION

Before addressing the merits of this contract dispute, the Court must first decide what law to apply. The Lease provides that the agreement "shall at all times be governed by and construed in accordance with the laws of the Commonwealth of Kentucky." R. 6-1 at 33 (section 13.8). And neither party disputes that Kentucky law applies. In Kentucky, the interpretation of a contract is a question of law for the court. *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006). Courts must give effect to the plain and unambiguous

2

terms of a contract.  *Id.*  If the contract is unambiguous, the court looks "only as far as the four corners of the document" to determine the parties' intent.  *Id.*  The contract "must be construed as a whole," giving effect to "every word in it, if possible."  *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992).

Elkhorn contends that Enterprise breached two contractual obligations: (1) to mine EMC #8 until all of the mineable and merchantable coal ("M and M coal") is exhausted, and (2) to provide notice and receive Elkhorn's approval before surrendering any coal premises in the leasehold.  But the Lease—as amended by the supplements—does not impose either duty on Enterprise.

**I.     Duty to Mine**

When a lease requires the lessee to mine a specific amount of a coal or mine until a coal seam is exhausted, the requirement is usually explicit.  *See, e.g., Hall v. Eversole's Adm'r*, 64 S.W.2d 891, 893 (Ky. 1933) ("The second parties agree to mine not less than 40,000 tons of coal from the Harlan seam of coal during each year of the life of the lease."); *Laurence E. Tierney Land Co. v. Kingston-Pocahontas Coal Co.*, 43 S.W.2d 517, 519 (Ky. 1931) ("In case the lessee . . . shall fail to work and operate [the leasehold] for a period of four (4) months, at any one time, then this lease . . . shall be forfeited."); *Muncey Coal Mining Co. v. Muncey*, 268 S.W. 293, 293 (Ky. 1925) ("[L]essee agrees that he will mine from the leased premises such an amount of coal during each and every year of this lease . . . as will amount to and make the royalty due at least twelve hundred dollars.").  But the Lease in this case does not explicitly impose a duty to mine a certain amount of coal nor, indeed, to mine any coal at all.

Two sections of the Lease indicate that Enterprise does not have any duty to mine—much less a duty to mine all of the M and M coal in the leasehold. The first, section 1.1, recites the duration of the Lease: Elkhorn leased premises to Enterprise for two years or until Enterprise mined all of the M and M coal, whichever occurred first. R. 6-1 at 2. Enterprise has a unilateral right to renew the Lease from year to year for up to thirteen additional years; if Enterprise does not give notice of intent to terminate, the Lease renews automatically. *Id.* at 2–3. Because Enterprise had complete discretion over whether to renew the lease after the second year, it could terminate the lease before mining all of the coal. Thus, from the outset, the parties contemplated that Enterprise might not mine all of the M and M coal in the leasehold.

The second section supporting the absence of a duty to mine is section 4.1. For the two-to-fifteen years that Enterprise could lease Elkhorn's land, section 4.1 of the Lease gives Enterprise "the right to develop the Leasehold at Enterprise's discretion." 6-1 at 6. "[A]t Enterprise's discretion" likely means that Enterprise does not have a duty to mine coal. The minimum royalties clause in section 4.1 supports this interpretation. Evidently anticipating that Enterprise might not produce any coal, section 4.1 also provides that Enterprise must pay minimum royalties to Elkhorn "regardless of Enterprise's failure to produce coal from the Leasehold," *id.*, as provided for by section 5.1, *id.* at 11 (describing the minimal-royalty requirement). Yet again, the Lease specifically contemplates that Enterprise might not mine all of the M and M coal in the leasehold.

In an attempt to get around sections 1.1 and 4.1, Elkhorn alleges that sections 5.4 and 13.14 imply that Enterprise has a duty to mine. Section 5.4 provides that if Enterprise "encounters or leaves unmined" coal that it finds unmineable or unmerchantable, then it may

4

give Elkhorn an "Abandonment Notice" and abandon that section of the mine. R. 6-1 at 12–13. Elkhorn could accept the Abandonment Notice and declare the abandoned coal no longer part of the leasehold, or it could reject the Notice, meaning the coal would remain part of the Lease. *Id.* If Elkhorn accepted the Notice, it could then lease the abandoned coal to another company. *Id.* However, Enterprise could abandon the coal as unmineable and unmerchantable only if Elkhorn consented or a "proper court of last resort" determined that the coal was unmineable and unmerchantable. *Id.* at 12. Section 13.14 lists factors to consider when determining whether coal is unmineable and unmerchantable and gives Elkhorn the right to inspect the coal before Enterprise abandons it. R. 6-2 at 8 (First Supplement to the Lease).

Construed in light of the contract as a whole, *see Morganfield Nat'l Bank*, 836 S.W.2d at 895, section 5.4 does not direct Enterprise to mine. Rather, section 5.4 outlines a procedure for abandoning a section of coal and deeming it no longer part of the leasehold. Unless a section of coal is abandoned, it remains part of the leasehold and subject to the other provisions of the Lease. For example, Enterprise must make minimum royalty payments on any unmined-but-not-abandoned coal under section 5.1 of the Lease. *See* R. 6-1 at 11 (requiring Enterprise to make minimum royalty payments "[d]uring the term of [the] Lease" and "until the exhaustion of all [M and M coal]"). Section 5.3 gives Enterprise the option to pay the royalties on the last 10 percent of the M and M coal in advance and either abandon the remaining coal or mine it without any further payment. *Id.* at 12. Finally, under section 7.1, Enterprise must pay all taxes due on the leasehold—including "unmined mineral taxes." *Id.* at 16. So any coal on the premises would be taken into account for the purposes of sections 5.1, 5.3, and 7.1, unless the coal was abandoned in accordance with section 5.4.

Section 5.4 is central to the Lease because many other provisions depend on the existence and quantity of M and M coal in the leasehold. But section 5.4 does not impose a duty to mine any of that coal.

In addition to section 5.4, Elkhorn points to several provisions in Article VIII of the Lease to find a duty to mine: sections 8.1, 8.6, and 8.8.[1] Section 8.1 obligates Enterprise to "conduct[ ]" its "mining operations" "in a skillful, efficient, and workmanlike manner." R. 6-1 at 18. Enterprise must (1) employ modern, efficient, and adequate machinery and methods, (2) develop the property according to a recognized standard and proper system of mining, and (3) develop the property in a manner to recover the greatest amount of M and M coal from the leasehold. *Id.* Section 8.6 requires Enterprise to "conduct its mining operations in accordance with the terms of this Lease and according to the general plans provided for herein." *Id.* at 20. In section 8.8, Enterprise agreed to "work and mine the coal . . . to substantial conformity with general plans of mining," which must be approved by Elkhorn. *Id.* at 21.

As the Court explained in its prior order, Article VIII contains Enterprise's promises regarding how it will conduct its mining operations. *See* R. 18 at 4–5. Article VIII does not itself impose a duty to mine, nor does it forbid Enterprise from shutting down mining operations. *Id.* Rather, *if* Enterprise mines, it must mine in a workmanlike manner, to recover the greatest amount of coal, and according to a mining plan approved by Elkhorn. *See Elkhorn Coal Corp. v. By-Products Coal Co.*, 35 S.W.2d 898, 901 (Ky. 1931) (holding

---

[1] Elkhorn references section 8.2, but does not develop an argument. In any event, section 8.2 directs Enterprise to employ a mining engineer to prepare maps and mining plans—it does not impose a duty to mine.

that a lease provision requiring the lessor to "conduct their mining operations according to the general plans [provided for in the lease]" did not impose a duty to mine).

According to Elkhorn, Enterprise provided a mining plan in 2011 that included mining projections through 2015. Elkhorn contends that, under section 8.8, Enterprise must mine according to the 2011 plan; that is, Enterprise must continue mining through its 2015 projections. But section 8.8 also states that Enterprise shall have "final discretion in selecting and prosecuting its plan of mining." R. 6-1 at 22. Even though section 8.8 obligates Enterprise to mine "to substantial conformity" with the 2011 mining plan, section 8.8 also vests Enterprise with discretion in prosecuting that plan—including the discretion to not mine at all. *See Elkhorn*, 35 S.W.2d at 901. Elkhorn reads sections 4.1 and 8.8 as giving Enterprise discretion to mine at whatever pace it chooses except the pace of not at all. But there is no basis in the four corners of the lease for that distinction. And *Elkhorn* has already foreclosed inferring a duty to mine from the vague requirement to "conduct mining operations according to the general plan." *Id.*

**B.     Right to Surrender**

In 2005, the parties supplemented the Lease by adding section 5.1(f). R. 6-6 at 7–8 (Fourth Supplement to the Lease). Section 5.1(f) gives Enterprise two alternative means of surrendering coal premises. The section provides that Enterprise may release and surrender any of the leasehold premises "either upon (i) [Enterprise] mining all of the mineable and merchantable coal within any such premise area and/or (ii) by providing written notice to [Elkhorn] that [Enterprise] desires to surrender such area (the 'Surrender Notice')." R. 6-6 at 8. Any ambiguity created by the "either"/"and/or" construct is clarified by the example given later in section 5.1(f): "For example, if [Enterprise] provides [Elkhorn] a Surrender

7

Notice on March 15, 2006 that it has *either* mined all mineable and merchantable coal *or* elected to surrender the Big Branch Premises, then the Minimum Royalties due under this Lease on January 1, 2007 shall be reduced [according to the terms of this section]." *Id.* (emphasis added). Section 5.1(f) unambiguously states that Enterprise may surrender a premise *either* by mining all of the M and M coal, *or* by providing a Surrender Notice. Here, Enterprise sent Elkhorn a Surrender Notice for the Sugar Branch Premises, including EMC #8. R. 6-12 (Letter dated September 24, 2012). The Lease requires nothing more.

Elkhorn contends that this reading would make section 5.1(f) inconsistent with section 5.4. But sections 5.4 and 5.1 can be construed in a way that gives effect to both. When the parties executed the original Lease, the Lease covered just one premise: the Big Branch Premises. *See* 6-2 at 2 (describing the original leasehold as the "Big Branch Premises."). Section 5.4 outlined the process for abandoning any given section of the Big Branch Premises. *See* R. 6-1 at 12 (outlining the process for abandoning coal "[i]f [Enterprise] . . . leaves unmined, as unmineable or unmerchantable coal, any *part or portion* of the coal covered [by the Lease]" (emphasis added)). After adding several additional premises to the Lease, the parties drafted section 5.1(f). Unlike section 5.4, section 5.1(f) recites the procedure for surrendering an entire premises, rather than just part of one. Thus, if Enterprise wanted to abandon any section of a premises—i.e., EMC #8 but not the rest of Sugar Branch—then the provisions of section 5.4 would apply. But if Enterprise sought to surrender an entire premises, as it did here, then section 5.1 would govern the surrender.

Even if section 5.1(f) is inconsistent with other sections of the original Lease— including section 5.4—the Fourth Supplement contemplates just such a conflict. And "in the event of an inconsistency," the supplement provides that the "terms and provisions of this

8

Fourth Supplement shall prevail." R. 6-6 at 9. Thus to the extent that sections 5.4 and 5.1 conflict, the Court must give effect to section 5.1 and the unilateral right of surrender the section gives to Enterprise.

## CONCLUSION

Enterprise did not breach the terms of the Lease. The Lease did not impose on Enterprise a duty to mine, and it gave Enterprise a unilateral right to surrender the Sugar Branch Premises. Accordingly, it is **ORDERED** that:

(1)  Elkhorn's Motion for Summary Judgment, R. 103, is **DENIED**.

(2)  Enterprise's Motion for Summary Judgment, R. 98, is **GRANTED**.

(3)  This matter is **STRICKEN** from the Court's active docket.

(4)  A judgment will be issued contemporaneously with this order.

This the 18th day of February, 2015.

Signed By:
*Amul R. Thapar* AT
United States District Judge